**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| ROBERT W. CAYWOOD, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| MILLARD DREXLER, JAMES COULTER, STEVEN GRAND-JEAN, JOSHN WESTON, STUART SLOAN, MARY CASATI, HEATHER REISMAN, DAVID HOUSE, STEPHEN SQUERI, J.CREW GROUP, INC., TPG CAPITAL L.P., LEONARD GREEN & PARTNERS, L.P., CHINOS HOLDINGS, INC., and CHINOS ACQUISITION CORPORATION, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

Index No. _____

CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS, AND FOR VIOLATION OF STATE LAW BREACHES OF FIDUCIARY DUTY

**JURY TRIAL DEMANDED**

Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this action on behalf of the public stockholders of J.Crew Group, Inc. ("J. Crew" or the "Company") against J. Crew and its Board of Directors (the "Board" or the "Individual Defendants"),  seeking equitable relief for their violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9"), arising out of their attempt to sell the Company to TPG Capital L.P. and Leonard Green & Partners, L.P. by means of an unfair process and for an unfair price of $43.50 per share in cash for each share of J. Crew common stock (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $3 billion.

2.     As described below, the Individual Defendants agreed to sell the Company to the Buyout Group (as defined in ¶ 26)  at an unfair price in order to gain lucrative benefits for themselves, as well as other Company insiders, to the detriment of J. Crew's public shareholders. Specifically, Millard Drexler ("Drexler"), the Company's Chairman and Chief Executive Officer, has entered into a rollover agreement with the Buyout Group pursuant to which Drexler has agreed to contribute 2,287,545 shares of Company common stock (the equivalent of a $99,508,207.50 investment based upon the per share merger consideration of $43.50 per share) to the Buyout Group in exchange for equity securities in the post-merger company. While all of the Company's public shareholders are being cashed out at an unfair price, Drexler, as a result of the rollover agreement, will continue to own approximately 8.8% of the post-merger company. In addition, as described in the Schedule 14A Proxy Statement (the "Proxy") filed with respect to the Proposed Transaction "other members of the Company's management team will also have the opportunity to invest in the post-merger company prior to, or after, the special meeting for the Proposed Transaction."

3.     Drexler has also entered into a new employment agreement with the Buyout Group pursuant to which Drexler will become the post-merger company's CEO and Chairman of the board and will receive a base salary of $200,000 and the opportunity to receive performance-based bonuses of up to an additional $800,000.  Another director, James Coulter ("Coulter") is a founding partner of TPG Capital, L.P., who is part of the Buyout Group. Another director, Heather Reisman ("Reisman"), recused herself from many Board meetings with respect to the Proposed Transaction and informed the Board that "she too was a potentially interested party given the fact that her husband is a founding partner of and she is a board member of a private equity firm that might be interested in participating with TPG in a transaction involving the sale

of the Company." Another director, Steven Grand-Jean ("Grand-Jean") provides financial advisory and investment services to certain TPG employees. Moreover, all of the Company's executive officers and directors hold unvested and restricted stock of the Company that prior to the consummation of the Proposed Transaction will vest and no longer be subject to restrictions and will entitle the holders to receive the Proposed Transaction consideration of $43.50 per share.

4.      Given their material conflicts of interests, the Board was unable to adequately perform their fiduciary duties and accepted a Proposed Transaction that was in their best interests and to the detriment of the Company's shareholders.

5.      As described below, the Proposed Transaction consideration is inadequate. For example, the Proposed Transaction represents a paltry premium of just 15.53% based on the closing price of J. Crew stock on November 22, 2010, the day prior to the announcement of the Proposed Transaction. In addition, in the few months prior to the Proposed Transaction, J. Crew stock had been trading well in excess of the Proposed Transaction offer price of $43.50. In fact, as recently as April 2010, J. Crew's stock traded at over $50 per share.  Further, at least three Wall Street analysts had price targets for J. Crew common stock greater than the Proposed Transaction consideration. Oppenheimer had a price target for the Company of $50.00 per share, Baird had a price target of $49.00 per share, and Atlantic Equities had a price target of $44.00 per share.

6.      Moreover, on December 6, 2010, the Company filed the Proxy with the Securities and Exchange Commission in connection with the Proposed Transaction. The Proxy fails to provide the Company's shareholders with material information and/or provides them with

materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

7.     Without imminent court intervention, Plaintiff and the Class will suffer irreparable harm if they must decide whether to vote on the Proposed Transaction based on a Proxy that contains materially misleading information and omissions of material fact. Accordingly, this action seeks to enjoin the Proposed Transaction and require Defendants to disseminate an accurate and complete Proxy that fully and fairly informs shareholders all material information in a non-misleading manner.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14a-9. This court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

9.     Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District.  In addition, J. Crew maintains its principal executive offices in New York, New York.

## PARTIES

10.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of J. Crew.

11.     J. Crew is a corporation organized and existing under the laws of the State of Delaware.  It maintains its principal corporate offices at 770 Broadway, New York, New York 10003, and is a nationally recognized multi-channel retailer of women's, men's and children's apparel, shoes and accessories.

12.     Defendant Millard Drexler has been the President, Chief Executive Officer, and a director of the Company since 2003. Drexler beneficially owns approximately 11.8% of the total number of outstanding shares of Company common stock.

13.     Defendant James Coulter has been a director of the Company since 1997.  Coulter is a founding partner of TPG Capital, L.P.

14.     Defendant Steven Grand-Jean ("Grand-Jean") has been a director of the Company since 2003.

15.     Defendant Josh Weston ("Weston") has been a director of the Company since 1998.

16.     Defendant Stuart Sloan ("Sloan") has been a director of the Company since 2003.

17.     Defendant Mary Casati ("Casati") has been a director of the Company since 2006.

18.     Defendant Heather Reisman ("Reisman") has been a director of the Company since 2007.

19.     Defendant David House ("House") has been a director of the Company since 2007.

20.     Defendant Stephen Squeri ("Squeri") has been a director of the Company since 2010.

21.     Defendants referenced in ¶¶ 13 through 20 are collectively referred to as Individual Defendants and/or the J. Crew Board. The Individual Defendants as officers and/or directors of J. Crew, have a fiduciary relationship with Plaintiff and other public shareholders of J. Crew and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

22.     TPG Capital is the global buyout group of TPG, a leading private investment firm founded in 1992, with more than $48 billion of assets under management and offices in San

Francisco, Beijing, Fort Worth, Hong Kong, London, Luxembourg, Melbourne, Moscow, Mumbai, New York, Paris, Shanghai, Singapore and Tokyo. TPG has previously owned the Company.   In 1997, the Company completed a leveraged recapitalization with an entity controlled by affiliates of TPG, pursuant to which TPG acquired approximately 85.2% of the shares of the Company's outstanding common stock, with management holding the remaining outstanding shares of common stock. Following the Company's initial public offering in July 2006, TPG's beneficial ownership of the Company's outstanding common stock was reduced to approximately 39.2%. The remaining shares of the Company's common stock beneficially owned by TPG were subsequently sold from time to time into the market such that, by April 2009, TPG ceased to beneficially own any shares of the Company's common stock.

23.     Leonard Green & Partners, L.P. is a leading private equity firm with over $9 billion in equity capital under management. Based in Los Angeles, Leonard Green & Partners invests in market leading companies across a range of industries.

24.     Defendant Chinos Holdings, Inc. is a Delaware corporation and is an affiliate of TPG Capital and Leonard Green & Partners, L.P. that was created for the purposes of effectuating the Proposed Transaction.

25.     Defendant Chinos Acquisition Corporation is a Delaware Corporation and a wholly owned subsidiary of Chinos Holdings, Inc. that was created for the purposes of effectuating the Proposed Transaction.

26.     TPG Capital , Leonard Green & Partners, L.P., Chinos Holdings, Inc., and Chinos Acquisition Corporation are collectively referred to herein as the "Buyout Group."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

27.    By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of J. Crew and owe them, as well as the Company, a duty of highest good faith, loyalty and full, candid and adequate disclosure.

28.    Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; (ii) a break up of the corporation's assets; or (iii) sale of the corporation, the Directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)    contractually prohibits them from complying with their fiduciary duties;

(d)    will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(e)    will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

29.    In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)      participating in any transaction where the Individual Defendants' loyalties are divided;

(b)      participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)      unjustly enriching themselves at the expense or to the detriment of the public shareholders.

30.      Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and good faith owed to Plaintiff and other public shareholders of J. Crew, or are aiding and abetting others in violating those duties.

31.      Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest. Defendants are knowingly or recklessly breaching their fiduciary duties of candor by failing to disclose all material information concerning the Proposed Transaction, and/or aiding and abetting other Defendants' breaches.

### CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

32.      In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

33.     During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) permit the Buyout Group to attempt to eliminate the public shareholders' equity interest in J. Crew pursuant to a defective sales process, and (ii) permit the Buyout Group to buy the Company for an unfair price. In furtherance of this plan, conspiracy and course of conduct, Defendants, and each of them, took the actions as set forth herein.

34.     Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.  The Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action on its own behalf and as a class action on behalf of all owners of J. Crew common stock and their successors in interest, except Defendants and their affiliates (the "Class").

36.     This action is properly maintainable as a class action for the following reasons:

(a)     the Class is so numerous that joinder of all members is impracticable.  As of December 7, 2010, J. Crew has approximately 63.74 million shares outstanding.

(b)     questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Have the Individual Defendants misrepresented and omitted material facts in violation of Section 14(a) of the Exchange Act;

(ii)    Have the Individual Defendants breached their fiduciary duties owed by them to Plaintiff and the others members of the Class;

(iii)   Are the Individual Defendants, in connection with the Proposed Transaction of J. Crew by Buyout Group, pursuing a course of conduct that is in violation of their fiduciary duties;

(iv)    Have the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(v)     Have J. Crew and Buyout Group aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(vi)    Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

(g)    Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## FURTHER SUBSTANTIVE ALLEGATIONS

37.    J. Crew is a nationally recognized multi-channel retailer of women's, men's and children's apparel, shoes and accessories. As of November 23, 2010, the Company operates 250 retail stores (including 221 J.Crew retail stores, 9 crewcuts and 20 Madewell stores), the J. Crew catalog business, jcrew.com, madewell.com and 85 factory outlet stores.

38.    The Company has been performing very well recently and is poised for even more growth.  On August 26, 2010, the Company announced its financial results for the second quarter ending July 31, 2010. Among the financial highlights, the Company reported that:

- Revenues increased 14% to $407.5 million compared to the same period in 2009.

- Gross margin increased to 44.6% of revenues from 41.2% of revenues in the second quarter of fiscal 2009.

- Operating income increased 83% to $59.0 million, or 14.5% of revenues, compared to $32.2 million, or 9.0% of revenues, in the second quarter of fiscal 2009.

- Net income was $34.9 million, or $0.53 per diluted share, compared to net income of $18.6 million, or $0.29 per diluted share, in the second quarter of fiscal 2009.

Defendant Drexler was pleased with the strong quarter and looked forward to a bright future, stating: "While we are really pleased with the second quarter, it is more critical than ever to continue to move forward and invest in our business for quality, long term, earnings growth. It's about moving, doing, creating – it never stops."

39.    In a press release dated November 23, 2010, the Company announced that it had entered into a merger agreement with the Buyout Group pursuant to which funds affiliated with TPG Capital and Leonard Green & Partners will acquire the Company for $43.50 per share.

40.     The Proposed Transaction consideration is inadequate. First the Proposed Transaction represents a paltry premium of just 15.53% based on the closing price of J. Crew stock on November 22, 2010, the day prior to the announcement of the Proposed Transaction. In addition, in the few months prior to the Proposed Transaction, J. Crew stock had been trading well in excess of the Proposed Transaction offer price of $43.50. In fact, as recently as April 2010, J. Crew's stock traded at over $50 per share.

41.     Further, at least three Wall Street analysts had price targets for J. Crew common stock greater than the Proposed Transaction consideration. Oppenheimer had a price target for the Company of $50.00 per share, Baird had a price target of $49.00 per share, and Atlantic Equities had a price target of $44.00 per share.

42.     The Buyout Group was very excited about being able to pick up J. Crew at such a low price. Carrie Wheeler, Partner of TPG Capital, stated: "We are proud of our 13-year history with J.Crew since our investment in the company in 1997 and the success it has achieved during our partnership with Mickey. With his leadership, combined with the support of TPG Capital and Leonard Green & Partners, the Company will be well positioned for the long term. We are looking forward to working with Mickey and his exceptional team and are excited by the prospect of continuing to expand the business."   Jonathan Sokoloff, Managing Partner of Leonard Green & Partners, said: "J.Crew occupies a distinctive space in fashion retail and we are very pleased to partner with Mickey and TPG Capital for the next chapter of the Company's growth. J.Crew's strong brand equity and proven multichannel strategy position the Company extremely well to expand its business, both in the U.S. and internationally."

43.     J. Crew shareholders are being cashed out at the unfairly low price of $43.50 per share, which doesn't adequately take into account the tremendous growth potential for J. Crew.

Accordingly, Buyout Group is picking up J. Crew at the most opportune time, at a time when J. Crew is poised for growth and its stock price is trading at a huge discount to its intrinsic value. Rather the Board agreed to the Proposed Transaction for their own self interests.

### *J.Crew's Executives Officers and Directors Stand to Receive Unique Material Financial Benefits in the Acquisition Not Available to J.Crew's Public Shareholders*

44.     The Company's executive officers and directors have material conflicts of interest and are acting to better their own personal interests through the Acquisition at the expense of J. Crew's public shareholders.

45.     Defendant Drexler beneficially owns approximately 11.8% of the total number of outstanding shares of Company common stock. Drexler, and trusts affiliated with Drexler, entered into a rollover agreement with the Buyout Group pursuant to which Drexler has agreed to contribute 2,287,545 shares of Company common stock (the equivalent of a $99,508,207.50 investment based upon the per share merger consideration of $43.50 per share) to the Buyout Group in exchange for equity securities in the post-merger company. While all of the Company's public shareholders are being cashed out at an unfair price, Drexler, as a result of the rollover agreement, will continue to own approximately 8.8% of the post-merger company.

46.     Drexler has entered into a new employment agreement with the Buyout Group pursuant to which he will become the post-merger company's CEO and Chairman of the board. Pursuant to this employment agreement, Drexler will receive a base salary of $200,000 and the opportunity to receive performance-based bonuses of up to an additional $800,000. In addition, in the event Drexler is terminated without cause or resigns for good reason within four years of his employment, he will be entitled to receive significant severance payments that include:

- a payment equal to any accrued but unpaid base salary as of the date of termination, the value of any accrued vacation pay, and the amount of any expenses properly incurred by Mr. Drexler prior to the termination date and not

yet reimbursed;

- a payment equal to one year's base salary plus Mr. Drexler's target bonus;

- a payment equal to the pro-rated annual bonus that Mr. Drexler would have earned for the year in which his termination occurs, based on the actual achievement of applicable performance objectives in the performance year in which the termination date occurs; and

- the immediate vesting of all equity awards previously granted to Mr. Drexler that remain outstanding as of the termination date.

47.    Further, as described in the Proxy, other members of the Company's management team will also have the opportunity to invest in the post-merger company prior to, or after, the special meeting for the Merger.  As stated in the Proxy:

TPG agreed with Mr. Drexler to cause [the post-merger company] to adopt a new management incentive plan in connection with the consummation of the merger with the following terms:

- 10% of the shares of Class A common stock of [the post-merger company], calculated on a fully-diluted basis immediately following the consummation of the merger, will be reserved for issuance under such plan and will be available for issuance to senior management and other employees of the surviving corporation;

- Mr. Drexler will receive option awards with respect to 40% of the shares reserved for issuance under such plan, and options to purchase approximately 45% of the shares reserved for issuance under such plan will be granted to other senior management and key employees, in each case, as soon as practicable after consummation of the merger and the remaining shares reserved for issuance under such plan will be reserved for issuance at a later date; and

- Although no definitive arrangements have been entered into to date, certain members of our management team and other key employees may be invited to invest in the equity of Parent at the same price as Mr. Drexler.

As further stated in the Proxy:

[The Buyout Group] has indicated that it or its affiliates may pursue agreements, arrangements or understandings with the Company's executive officers, which may include cash, stock and co-investment opportunities. Prior to the effective time of the merger and with the prior consent of the special committee, [the

Buyout Group] may initiate negotiations of these agreements, arrangements and understandings, and may enter into definitive agreements regarding employment with, or the right to participate in the equity of, the surviving corporation or [the Buyout Group] on a going-forward basis following the completion of the merger.

48.    Moreover, the Company's directors and executive officers hold unvested stock options to acquire J. Crew common stock that, pursuant to the merger agreement, will automatically vest and entitle the holder to receive the Proposed Transaction consideration of $43.50 per share. The following charts show the amount and value of the unvested stock options held by the Company's directors and executive officers that they will be able to cash out as a result of the Proposed Transaction:

| Name | Unvested Stock Options That Will Vest as a Result of the Merger | |
| --- | --- | --- |
| | Shares | Value |
| *Executive Officers*(1) | | |
| Trish Donnelly | 81,250 | $  1,091,744 |
| Millard Drexler | 971,250 | 13,167,219 |
| Jenna Lyons | 448,000 | 6,688,863 |
| Lynda Markoe | 84,000 | 1,239,338 |
| James Scully | 191,250 | 2,974,838 |
| Libby Wadle | 273,750 | 4,527,531 |
| *Non-Employee Directors*(2) | | |
| Mary Ann Casati | 2,589 | $  7,948 |
| James Coulter | 2,589 | 7,948 |
| Steven Grand-Jean | 2,589 | 7,948 |
| David House | 2,589 | 7,948 |
| Heather Reisman | 2,589 | 7,948 |
| Stuart Sloan | 2,589 | 7,948 |
| Stephen Squeri | 6,542 | 55,476 |
| Josh Weston | 2,589 | 7,948 |
| *All Executive Officers and Directors holding Stock Options as a group* | 2,074,165 | $  29,800,645 |

49.    The Merger Agreement also provides that all restricted stock held by the Company's directors and executive officers will vest and no longer be subject to restrictions at

the effective time of the merger and will entitle the holder to $43.50 per share. The following charts show the amount and value of the restricted shares held by the Company's directors and executive officers that they will be able to cash out as a result of the Proposed Transaction:

| | Aggregate Number of Restricted Shares | Value of Restricted Shares |
|---|---|---|
| ***Executive Officers*(1)** | | |
| Trish Donnelly | 24,500 | $ 1,065,750 |
| Millard Drexler | 10,000(2) | 435,000 |
| Jenna Lyons | 50,000(3) | 2,175,000 |
| Lynda Markoe | 12,000 | 522,000 |
| James Scully | 32,500 | 1,413,750 |
| Libby Wadle | 34,000 | 1,479,000 |
| ***Non-Employee Directors*(4)** | | |
| Mary Ann Casati | 1,236 | $ 53,766 |
| James Coulter | 1,236 | 53,766 |
| Steven Grand-Jean | 1,236 | 53,766 |
| David House | 1,236 | 53,766 |
| Heather Reisman | 1,236 | 53,766 |
| Stuart Sloan | 1,236 | 53,766 |
| Stephen Squeri | 713 | 31,016 |
| Josh Weston | 1,236 | 53,766 |
| ***All Executive Officers and Directors holding Restricted Shares as a group*** | 172,365 | $ 7,497,878 |

50.    In addition, director Coulter is a founding partner of TPG and a director and officer in TPG VI's ultimate general partner, TPG Group Holdings (SBS) Advisors, Inc. As such, Mr. Coulter and his affiliates will have direct and indirect interests in the Company after the merger.

51.    Moreover, Drexler and James Scully, the Company's CFO, each has a passive investment interest in certain investment funds affiliated with TPG VI, to which Mr. Drexler has contributed approximately $1.3 million in the aggregate and Mr. Scully has committed to contribute approximately $500,000, in the aggregate. In addition, in the ordinary course of business Mr. Grand-Jean provides financial advisory and investment services to certain TPG employees.

52.     Based on the above, the Proposed Transaction is unfair to J. Crew's public shareholders, and represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members

***The Unfair Process***

53.     The Individual Defendants conducted a flawed process with respect to the sale of the Company and failed to adequately shop the Company to other prospective acquirers or even engage in meaningful discussions with unsolicited parties that had expressed an interest in a transaction with the Company. Rather, the Individual Defendants entered into a transaction with the Buyout Group that was in their best interests and to the detriment and expense of the Company's public shareholders.

54.     First, the Board and/or special committee that was formed to review the Buyout Group's proposal and other alternatives ("Special Committee") failed to solicit even a single potential acquiror prior to execution of the merger agreement with the Buyout Group. In addition, two unsolicited parties, Party A and Party B, were interested in pursuing a potential acquisition of the Company, but the Board and/or Special Committee failed to engage in meaningful discussions with the two parties but rather favored a transaction with the Buyout Group.

55.     For example, on September 15, 2010, Drexler received a call on behalf of the chief executive officer of Party A, during which Party A indicated its potential interest in a transaction involving the Company. Party A has contacted Mr. Drexler from time to time in the past several years to indicate its interest in a potential transaction with the Company.    In addition, on October 15, 2010, Mr. Drexler received a call from a representative of a private

equity fund, Party B, during which such representative expressed Party B's interest in acquiring the Company.

56.     On October 15, 2010, Drexler reported his prior conversations with Party A and Party B to the Special Committee. Following the receipt of this information, the Special Committee or other Company representatives failed to engage in any meaningful discussions with Party A or Party B to discuss their interest.  On October 29, 2010, the Special Committee in fact specifically determined "not to engage at that time with other potential bidders, including Parties A and B."

57.     During the week of November 8, 2010, Drexler again received an email from a representative of Party B in which Party B expressed its interest in further discussing an acquisition of the Company. Drexler referred the indication of interest to Perella Weinberg, the Special Committee's financial advisor, who scheduled a meeting with Party B for November 16, 2010. At that meeting, a representative of Party B discussed with Perella Weinberg its potential interest in an acquisition of the Company. During the course of the meeting, Party B indicated, among other things, that it would only be interested in a potential transaction if Mr. Drexler was willing to remain with the Company following an acquisition of the Company by Party B. Following this meeting, there is no indication that the Special Committee and/or other Company representatives made any attempt to continue discussions with Party B. Even after Drexler informed the Special Committee that he "would be open to continuing his employment with the Company following a sale to an acquiror other than TPG," the Special Committee still failed to engage in discussions with Party A, Party B, nor contact other potential acquirors, but rather entered into the Proposed Transaction.

### The Preclusive Deal Protection Devices

58.     In addition, on November 26, 2010, the Company filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") wherein it disclosed the operating Agreement and Plan of Merger for the Proposed Transaction (the "Merger Agreement").  As part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

59.     In particular, § 5.2(a) of the Merger Agreement allows the Company to solicit parties for a mere 50 days, until January 15, 2010.  Upon expiration of the "go-shop" period, a strict "no solicitation" provision kicks in pursuant to § 5.2(b) and the Company must "immediately cease" soliciting other parties as well as engaging in discussions or negotiations with them in order to obtain a price in excess of the amount offered by the Buyout Group.  At that point, the Company may continue in discussions with only those parties that meet the strict definition of being considered an "Excluded Party." An Excluded Party is a party from whom the Company has received an acquisition proposal during the go-shop period of which "the Special Committee determines, in good faith...and after consultation with its financial advisor and outside legal counsel, constitutes or could reasonably be expected to lead to a Superior Proposal."

60.     Pursuant to § 5.2 of the Merger Agreement, should the Company receive a competing bid, the Company must notify the Buyout Group of the bidder's offer.  Thereafter, should the Board determine that the competing offer is superior, the Buyout Group must be provided with three business days notice before the Company changes its recommendation on the Proposed Transaction. If, during this time, the Buyout Group proposes an amendment to the

Merger Agreement to match the superior offer, the Board, pursuant to § 5.2, must consider this amendment in determining whether the competing bid is still superior. The Buyout Group is able to match the competing offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the offer.

61.     In other words, the Merger Agreement gives the Buyout Group access to any rival bidder's information and allows the Buyout Group a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor the Buyout Group and piggy-back upon the due diligence of the foreclosed second bidder.

62.     In addition, the Merger Agreement provides that a termination fee of $54,000,000 (or $27,000,000 in the event that the competing bid resulted from the "go-shop" process) and must be paid to the Buyout Group by J. Crew if the Company decides to pursue said other offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

***The Materially Misleading and Incomplete Proxy Statement***

63.     On December 6, 2010, the Company filed a Schedule 14A Proxy Statement (the "Proxy") with the SEC in connection with the Proposed Transaction. The Proxy fails to provide the Company's shareholders with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

64.     For example, the Proxy completely fails to disclose the underlying methodologies, key inputs and multiples relied upon and observed by Perella Weinberg Partners LP ("Perella Weinberg"), the Special Committee's financial advisor, so that shareholders can properly assess

the credibility of the various analyses performed by Perella Weinberg and relied upon by the

Board and the Special Committee in recommending the Proposed Transaction.  In particular, the

Proxy is deficient and should provide, *inter alia*, the following:

(i)     The calculations made by Perella Weinberg in the *Discounted Cash Flow Analysis* to calculate the free cash flows of the Company for years 2011 through 2015, as well as the free cash flow amounts for each such year (although it is disclosed in Perella Weinberg's November 22, 2010 presentation, it should be also disclosed on page 47 of the Proxy).

(ii)    The criteria used to select the 6.0x to 7.5x terminal year multiple range used in the *Discounted Cash Flow Analysis*, including which peer companies and the multiples observed for such companies that were used to calculate this range.

(iii)   The criteria used by Perella Weinberg to determine which companies it deemed the "most comparable" to the Company that were used in the *Selected Publicly Traded Companies Analysis*.

(iv)    The multiple ranges selected and calculations made by Perella Weinberg to calculate the implied per share equity reference range calculated in the *Selected Publicly Traded Companies Analysis*.

(v)     The criteria used by Perella Weinberg to determine which transactions were considered "relevant" and used in the *Selected Transactions Analysis*.

(vi)    The conclusions drawn by Perella Weinberg from the *Selected Transactions Analysis*.

(vii)   The transactions used and premiums observed in the *Illustrative Premiums Paid Analysis*.

65.     The Proxy also fails to describe material information concerning Party A and

Party B's unsolicited interest in a transaction with the Company, including the reasons the

Special Committee did not attempt to engage in discussions with such parties. In particular, the

Proxy:

(i)    States that Party A has contacted Mr. Drexler from time to time in the past several years to indicate its interest in a potential transaction with the Company, or to otherwise work with Mr. Drexler. The Proxy must disclose specifically when Party A contacted Drexler in the past several years to discuss a potential transaction, the extent of Party A's interest communicated to Drexler during these contacts, and whether and when Drexel informed the Board of such communications.

(ii)   Fails to disclose whether Party A indicated any financial terms in its September 15, 2010 expression of interest, and whether Party B indicated any financial terms in their October 15, 2010 expression of interest, and if so to disclose such terms.

(iii)  Fails to disclose the reasons Drexler waited until October 15, 2010 to inform other board members of Party A's September 15, 2010 call indicating their interest in a transaction.

(iv)   Fails to disclose whether Party B discussed any financial terms with respect to an acquisition of the Company during its November 16, 2010 meeting with Perella Weinberg, and if so to disclose such terms.

(v)    Fails to disclose whether and when the special committee ever asked Drexler whether he would be interested in a potential transaction with Party A or Party B, and if so, what Drexler's response was.

(vi)   Fails to disclose the reasons the Special Committee failed to attempt to negotiate a transaction with Company B, or contact other potential acquirers, considering Drexler informed the special committee on November 22, 2010 that he "would be open to continuing his employment with the Company following a sale to an acquiror other than TPG."

66.    The Proxy also fails to disclose material information concerning the events leading up to the Merger Agreement, including Drexler's communications with parties interested in acquiring the Company, as well as the special committee's discussions and negotiations with the Buyout Group. In particular, the Proxy:

(i)    States that "From time to time over the last several years, a number of parties have approached [Drexler] about possible transactions involving the sale of the Company" but fails to disclose how many

parties approached Drexler as well as whether Drexler communicated such interest to the Board.

(ii)  Fails to disclose whether Drexler and Coulter discussed Drexler's future involvement and/or rollover arrangements with any potential post-merger company at their September 1, 2010 dinner, as well as if Drexler and TPG discussed such matters at the September 13, 2010 meeting.

(iii)  Fails to disclose what "board materials" were sent to Coulter on September 10, 2010.

(iv)  Fails to disclose the reasons Drexler waited until October 7, 2010 to inform the Board of TPG's interest in a transaction with the Company, considering TPG had first indicated an interest on September 1, 2010.

(v)  Fails to disclose the criteria used to select directors Casati, House, Squeri, and Weston to serve on the Special Committee, and the criteria used to select Weston to serve as the chair of the committee.

(vi)  Fails to disclose the reasons the special committee determined on November 1, 2010 that pursuing TPG and Leonard Green's offer was not in the best interests of the Company's stockholders.

(vii)  Fails to disclose the reasons and analyses considered by the special committee in determining on November 9, 2010 that TPG's $45 offer merited further consideration, while having determined just a week earlier that the $41 offer was not in the best interests of the Company's stockholders and warranted ending discussions with TPG.

67.  The Proxy also fails to disclose material information concerning defendant Reisman's conflict of interest. The Proxy states that on October 14, 2010, Reisman "informed the other directors that she too was a potentially interested party given the fact that her husband is a founding partner of and she is a board member of a private equity firm that might be interested in participating with TPG in a transaction involving the sale of the Company." The Proxy must disclose whether the private equity firm referred to engaged in any discussions with

TPG regarding any investments or other participation in the acquisition of J. Crew or in the post-merger company, and the results of such discussions. The Proxy should also disclose the reasons defendant Reisman was not available to attend the November 22, 2010 meeting where the Board voted to approve entering into the Proposed Transaction.   Moreover, the Proxy states that defendant Grand-Jean "provides financial advisory and investment services to certain TPG employees," but fails to disclose the nature of such services and the amount of compensation received by Grand-Jean for such services.

68.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder

69.     Plaintiff repeats all previous allegations as if set forth in full herein.

70.     Defendants have issued the Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

71.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

72.     Specifically, the Proxy violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

73.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II
### Breach of Fiduciary Duty – Failure to Maximize Shareholder Value
### (Against All Individual Defendants)

74.     Plaintiff repeats all previous allegations as if set forth in full herein.

75.     As Directors of J. Crew, the Individual Defendants stand in a fiduciary relationship to Plaintiff and the other public stockholders of the Company and owe them the highest fiduciary obligations of loyalty and care.  The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize J. Crew's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

76.     As discussed herein, the Individual Defendants have breached their fiduciary duties to J. Crew shareholders by failing to engage in an honest and fair sale process.

77.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of J. Crew's assets and will be prevented from benefiting from a value-maximizing transaction.

78.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

79.     Plaintiff and the Class have no adequate remedy at law.

## COUNT II
### Breach of Fiduciary Duty -- Disclosure
### (Against Individual Defendants)

80.     Plaintiff repeats all previous allegations as if set forth in full herein.

81.     The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting J. Crew's shareholders.

82.     As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

83.     As a result, Plaintiff and the Class members are being harmed irreparably.

84.     Plaintiff and the Class have no adequate remedy at law.

## COUNT IV
### Aiding and Abetting
### (Against J. Crew and Buyout Group)

85.     Plaintiff repeats all previous allegations as if set forth in full herein.

86.     As alleged in more detail above, J. Crew and Buyout Group are well aware that the Individual Defendants have not sought to obtain the best available transaction for the Company's public shareholders.  Defendants J. Crew and Buyout Group aided and abetted the Individual Defendants' breaches of fiduciary duties.

87.     As a result, Plaintiff and the Class members are being harmed.

88.     Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)     declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(C)     enjoining, preliminarily and permanently, the Proposed Transaction;

(D)     in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)     directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(F)     awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)     granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.


Dated: December 13, 2010
    New York, NY                                    **LEVI & KORSINSKY, LLP**

                                        By: _____
                                            Jacob M. Jenkelowitz (JJ-9391)
                                            30 Broad Street, 15th Floor
                                            New York, New York 10004
                                            T:(212) 363-7500
                                            F: (212) 363-7171
                                            E: jjenkelowitz@zlk.com

                                            *Attorneys for Plaintiff*